## McFarland, Sheriff v. Georgetown National Bank.

(Decided February 24, 1925.)

### Appeal from Scott Circuit Court.

1. Taxation—Evidence Held Insufficient to Show Moneyed Capital of Individuals in Competition with National Banks.—Evidence held insufficient to show moneyed capital in hands of individuals, invested in bonds, notes, and other evidences of indebtedness, comes in competition with national banks, within Rev. Stats., U. S., section 5219 (U. S. Comp. Stats., section 9784) as to taxation of national bank shares.

2. Taxation—Tax on National Banks Payable to Local Authorities Held Valid.—Tax on national banks, state banks, and trust companies payable to local authorities in addition to state tax, imposed by Ky. Stats., section 4019a-10, under authority of Const., section 171, as amended in 1915, held valid under Rev. Stats., U. S., section 5219 (U. S. Comp. Stats., section 9784), though money in hand, notes, bonds, and other credits held by others were by same act exempt from all but state taxes.

3. Taxation—Congress May Authorize State's Collection of Taxes Against National Banks, though Such Taxes, when Levied, were Invalid.—It is within congressional power to authorize state's collection of taxes previously levied against national banks, though levy, when made, may have been invalid.

4. Taxation—County Clerk's Failure to Include County Taxes in Tax Bills Against National Banks Does Not Invalidate Corrected Bills Including Such Taxes.—That county clerk in making out tax bills against national banks, as required by Ky. Stats., section 4239a, by mistake failed to include in them county taxes does not invalidate corrected bills including such taxes.

5. Taxation—Tax on National Bank, Based on Assessment Increased Without Notice, is Invalid to Extent of Such Increase.—Under Ky. Stats., section 4019a-10, and section 4053, tax against national

bank on its stock, based on assessment increased by board without notice to taxpayer, is invalid to extent of such increase.

H. C. FORD, JAS. B. FINNELL, JR., and FORD & FORD for appellant.

BRADLEY & BRADLEY and JAMES BRADLEY for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

In 1915 the following amendment was made to section 171 of the Constitution:

"The General Assembly shall have power to divide property into classes and to determine what class or classes of property shall be subject to local taxation."

Under this provision it was enacted in 1917 as follows:

"Money in hand, notes, bonds, accounts and other credits, whether secured by mortgage, pledge or otherwise, or unsecured . . . shall be subject to taxation for state purposes only." Section 4019a, subsection 10, Kentucky Statutes.

By the same act it was provided that the shares of stock of national banks, state banks and trust companies are put in a class by themselves and are subject to a state tax on each $100.00, with this further provision:

"In addition thereto the said banks and trust companies shall pay to the local authorities in said counties, cities, towns and districts, taxes at the same rate imposed upon other personalty therein."

The result of the act is that the shares of stock in national banks, state banks and trust companies are subject to a state tax of 40c on each $100.00, while money in hand, notes, bonds, and other credits held by others are subject to taxation for state purposes only. Section 5219 of the U. S. Revised Statutes grants to the states the right to tax shares in the national banks, subject to this restriction:

"That the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state."

The Georgetown National Bank brought this action to enjoin the sheriff from collecting the county taxes from the bank for the years 1919, 1920, 1921 and 1922 on the ground that the state statute was in conflict with the federal statute and void. The circuit court adjudged the bank the relief sought. The defendants appeal.

In Hepburn v. School District, 23 Wallace 480, it was held that municipal and school taxes may be assessed upon the shares of a national bank, although mortgages, judgments, recognizances and moneys owing upon articles of agreement for the sale of real estate are exempt from taxation except for state purposes. In holding this the court said:

> "It could not have been the intention of Congress to exempt bank shares from taxation because some moneyed capital was exempt."

Again in Mercantile National Bank v. New York, 121 U. S. 138, it was held that the exemption from state taxation of saving banks deposits did not invalidate a statute taxing national banks. The court said:

> "The main purpose, therefore, of Congress in fixing limits to state taxation on investments in the shares of national banks, was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy."

This rule was adhered to in National Bank v. City of Boston, 125 U. S. 60, although it was shown there "that saving banks were permitted to transact a banking business in the way of loans upon personal securities, upon the ground that saving banks are substantially institutions organized for the purpose of investing the savings of small depositors and not a banking institution in the commercial sense of the word." These opinions were followed in Jenkins v. Neff, 186 U. S. 230, under a statute exempting from taxation against trust companies United States securities held by them. In Merchants' National Bank v. City of Richmond, 256 U. S. 635, the court had before it the statute of Virginia, under which

a tax for state purposes was imposed upon bank stock, state and national, at the rate of 35c and a tax for city purposes at the rate of $1.40, while upon intangible personal property in general, including bonds, notes and other evidences of indebtedness the state rate was 65c and the city rate 40c, or an aggregate of 95c upon each $100.00 of valuation as against a total of $1.75 on bank stocks. In that case the court said this:

"It also was shown by evidence, without dispute, that moneyed capital in the hands of individuals invested in bonds, notes and other evidences of indebtedness comes into competition with the national banks in the loan market."

Basing its judgment on this undisputed fact the court held the Virginia act invalid. After that decision was rendered the Congress of the United States passed the following act amending section 5219 of the Revised Statutes:

"Sec. 5219. The legislature of each state may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several states may tax said shares, or include dividends derived therefrom in the taxable income of an owner or holder thereof, or tax the income of such associations, provided the following conditions are complied with:
"1. (a) The imposition by said state of any one of the above three forms of taxation shall be in lieu of the others.
"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state coming into competition with the business of national banks: Provided, that bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.
"(c) In case of a tax on the net income of an association, the rate shall not be higher than the

rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing state upon the net income of mercantile, manufacturing, and business corporations doing business within its limits.

"(d)   In case the dividends derived from the said shares are taxed, the tax shall not be at a greater rate than is assessed upon the net income from other moneyed capital.

"2.   The shares or the net income as above provided of any national banking association owned by nonresidents of any state, or the dividends on such shares owned by such nonresidents, shall be taxed in the taxing district where the association is located and not elsewhere; and such associations shall make return of such income and pay the tax thereon as agent of such nonresident shareholders.

"3.   Nothing herein shall be construed to exempt the real property of associations from taxation in any state or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed.

"4.   The provisions of section 5219 of the Revised Statutes of the United States as heretofore in force shall not prevent the legalizing, ratifying, or confirming by the states of any tax heretofore paid, levied, or assessed upon the shares of national banks, or the collecting thereof, to the extent that such tax would be valid under said section.

"Approved March 4, 1923."

The Supreme Court of the United States has steadily held that the exemption of some capital is not invalid, unless the capital so exempted comes in competition with national banks. A statute of Kansas exempting from local assessment the capital stock of corporations invested in mining claims was held valid in Talbott v. County Commissioners, 139 U. S. 438. In First National Bank v. Chehalis, 166 U. S. 440, the same conclusion was reached as to other capital on the ground that it did not appear that the exempted capital came in competition with national banks. The same conclusion was reached in First National Bank v. Ayers, 160 U. S. 640, and in First National Bank v. Chapman, 173 U. S. 205, the ground of the decision in each of these cases being the want of a showing that the moneyed capital left unas-

sessed or any material portion thereof, came into competition with the national banks.

In this case it is not shown by evidence without dispute that the moneyed capital in the hands of individuals invested in bonds, notes and other evidences of indebtedness comes in competition with the national banks. While a number of witnesses so testify there is testimony to the contrary and the concluion of the witnesses testifying to the existence of competition is not borne out by the facts shown by all the testimony. It is shown by all the testimony that the banks make short time loans and that they decline to make loans on long time. It is also shown that the banks are lending to the limit and are rediscounting their paper in order to accommodate customers for a large part of the year. The moneyed capital of individuals is invested in notes given for the purchase money of land or secured by a mortgage on land running for a longer time than banks are willing to lend money for. It is not shown by anybody that any appreciable amount of money held by individuals is used in short time loans, such as the banks make, and this being true the capital invested in land notes and the like does not come in competition with the national banks, for they do not handle this character of paper. The facts shown by the record warrant the conclusion that no material part of the capital held by the individuals is so invested as to come in competition with the national banks and on the record we so hold.

The plain purpose of the act of Congress, approved March 4, 1923, was to remove the uncertainty following the decision of the U. S. Supreme Court in the Virginia case above referred to. To that end it was expressly provided in the act that ''bonds, notes and other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.'' Under that act the Kentucky statutes is valid. The 4th section of the act was added to prevent further confusion in the collection of such taxes, whether levied before or after the passage of the act. Among other things it expressly provides: ''The provisions of section 5219 of the Revised Statutes of the U. S., as heretofore in force, shall not prevent the legalizing, ratifying or confirming by the states of any tax heretofore paid, levied or as-

sessed upon the shares of national banks, or the collecting thereof, to the extent that such tax would be valid under said section.'' The words ''said section'' must mean the section as amended by this act; for else the words ''would be valid'' are meaningless; the provision plainly refers to taxes which would be valid under the act but might not be valid under the original act. The states needed no authority to collect taxes properly levied under the old act. The section was intended to give the power to collect taxes levied under the old act, if such levy was valid under the amended act. This is conclusively shown by the words, ''legalizing, ratifying or confirming,'' for there was no need to legalize, ratify or confirm previous levies if they were valid under the old statute. The state of Kentucky has ratified and confirmed the taxes heretofore levied and assessed by collecting them. This, as we know from the current history of the state, has been done for the years in question. Its proceeding by the sheriff to collect the taxes in question was an act ratifying and confirming the taxes theretofore levied and assessed and by the express words of the amendment, section 5219, ''shall not prevent . . . the collecting thereof to the extent that such tax would be valid under said section.''

We, therefore, conclude that the state statute is valid and that the state has authority to collect the taxes under it. There is no limitation upon the power of Congress to pass an act of this character authorizing the state to collect taxes previously levied.

In making out the tax bills for the years 1919, 1920 and 1921 the clerk, by mistake, failed to include in them the county taxes. In 1922, when this was called to his attention, he issued corrected tax bills including the county taxes, such as he should have issued originally. It is insisted that these corrected tax bills are void. By section 4239a, Kentucky Statutes, it is provided that the county clerk ''shall annually make out for the use of the sheriff or collector a book of tax bills and stubs.'' In making out this book he acts purely as a ministerial officer. He has no discretion to exercise. If he fails to perform his duty, under the statute he is liable on his bond and he may be required by a mandamus to make out the proper tax bills. He has not performed his duty until he makes out the tax bills correctly. In numerous cases this court has awarded a mandamus against a ministerial officer who had failed to discharge a duty im-

posed upon him by statute. But in such cases the officer is not required to wait until he is required by a mandamus to act. In this case the county clerk simply did what he would be required to do by mandamus if he had not made out the corrected tax bills voluntarily. The tax bills are therefore valid, for the public revenues are not to be defeated by the failure of a public officer to discharge a mere ministerial duty at the time he should have discharged it.

As to the year 1922 a different question arises. The bank in its report assessed its capital stock at $119,000.00. The board, without any notice to the taxpayer, raised this to $144,772.00. Section 4019a, subsection 10, provides for the assessment of bank stock, and it provides that the equalization, collection, penalties and laws relating thereto for other personal property shall apply in like manner to the collection of the taxes therein provided. Section 4053, Kentucky Statutes, provides as to other personal property as follows:

"If the value fixed by the assessor be greater than that fixed by the taxpayer, it shall be the duty of the assessor to notify the taxpayer at the time of the assessment the amount of such increase, and of the time and place of the meeting of the board of supervisors. The assessor shall report to the board of supervisors a list of all taxpayers in the county whose tax lists have been added to or increased by him after receiving them from the hands of the taxpayer, together with a short statement."

There being no notice to the taxpayer of the raise in the assessment as reported by him, the raise was invalid. The circuit court did not err in so holding. It is the plain purpose of the statute, taken as a whole, to require notice to the taxpayer when the valuation fixed by him is raised by the assessing officer. The statute does not require each taxpayer to watch the record and see what the assessing officer does after he returns his list. This would lead to endless confusion. Unless he has notice of a change in the valuation he has placed upon the property he has a right to assume that this valuation is unchanged. On the return of the case to the circuit court a judgment will be entered on the counterclaim for the amount of the taxes for 1922 upon the basis of the valuation fixed by the taxpayer, with interest from September 22, 1922. As to the other years a judgment will be

entered dismissing the petition and giving judgment on the counterclaim for the taxes, with interest from the time the amended tax bills were made.

Judgment reversed and cause remanded for a judgment as above indicated.